JOURNAL ENTRY AND OPINION
Plaintiff Courtyard on Coventry ("Courtyard") appeals from the judgment of the trial court which directed a verdict in favor of Giambrone Masonry, Inc. and its president, David Giambrone, (collectively referred to as "Giambrone") on Giambrone's counterclaim for payment for masonry services. For the reasons set forth below, we affirm.
In June 1996, Courtyard, through its Trustee, Lewis A. Zipkin, entered into an agreement with Giambrone for the performance of the masonry portion of construction of a multi-unit retail structure located at 1854-1876 Coventry Road in Cleveland Heights. On June 20, 1996, Zipkin sent a proposed agreement to Giambrone which indicated that Giambrone was to receive $314,600 and the work was to include, inter alia, face brick, concrete block, and installation of "Durawall," a ladder-shaped wire which connects exterior and interior masonry walls. Giambrone indicated on the proposed agreement that it would perform the project for $320,000 and excluded various items (other than "Durawall") from the job. Further, although both the proposal sent by Zipkin and the reply sent by Giambrone contained language by which the parties could designate "substantial completion" dates, no date of substantial completion was ever listed in the written documents.
Giambrone worked at the site from June 24, 1996 until December 12, 1996. On January 8, 1997, David Giambrone, completed an affidavit for a mechanic's lien at the premises in which he averred that Giambrone was owed $65,609.26, plus interest, on the project.
On January 24, 1997, Courtyard filed a complaint against Giambrone Masonry and David Giambrone. In relevant part, Courtyard alleged that the parties orally agreed that Giambrone would "complete the project with haste," not later than the end of summer 1996. Courtyard claimed that Giambrone did not use due diligence to complete the project, failed to substantially complete the project by the summer of 1996, and did not complete the project at all. Courtyard further alleged that Giambrone also breached oral agreements to keep the same foreman for the duration of the project, to staff the project with full crews, and to perform with high quality workmanship and in compliance with applicable building and safety codes. Courtyard asserted causes of action in fraud and negligence. It sought compensatory damages for expenses to complete the project, and loss of potential income, and also sought punitive damages.
Giambrone denied liability and asserted a counterclaim in which it alleged that it had substantially complied with all the terms of the agreement and that it was owed $79,944.14. Giambrone also filed a third party complaint against the county treasurer for foreclosure upon its mechanic lien.
The matter came to trial before a jury on August 16, 1998. For its key evidence, Courtyard presented the testimony of structural engineer and registered architect Joseph Nyzen, leasing agent Stephen Passov (by deposition), Stuart McLean (by deposition), Gary Rogalski (by deposition), Greg Bankhurst, construction manager for the project, and owners Andrew Goldstein and Lewis Zipkin.
Nyzen testified that a delivery truck struck the north corner of the building and, after examining the resulting damage, the owners requested that Nyzen view the building and determine whether the masonry work was properly performed. Nyzen viewed the structure from scaffolding and also probed the inside of some of the walls. According to Nyzen, the ties which the masons had used to connect the brick exterior wall to the block interior wall did not meet the drawings and specifications for the building and did not comply with the code. Nyzen testified that three-sixteenth rod anchors were to be installed at sixteen inch intervals stretching across and above. The failure to use these rods increased the risk that the building would buckle and that the brick wall would come off in a very high wind. Nyzen testified that it would cost between $90,000 and $130,000 to repair the problem.
He also testified that the interior walls were not properly crisscrossed and bonded at the corners. This problem could lead to localized breakage and leakage and plaintiff subsequently bonded the corners of the building in order to remedy this problem. Nyzen was also concerned that limestone had not been properly anchored to the front of the building.
On cross-examination, Nyzen admitted that he was retained by plaintiff two weeks prior to a scheduled trial date. He also admitted that he had no knowledge of whether plaintiff's construction manager ever voiced any complaint with the masonry work as it was being performed. He did not review the job logs for the project in order to determine whether a change order had been issued but, he admitted, such changes are commonplace. He did not know whether the corner of the building which was damaged was constructed by defendant or a second mason hired to finish the job.
Passov, a real estate broker, testified that he was the leasing agent and that plaintiff lost potential tenants because the building was not complete by the Christmas season of 1996. The building was not rented until the summer of 1997.
Stuart McLean, president of Avalon stores, testified that he had negotiated with Zipkin to lease a portion of the building. He hoped to open before the Christmas season, but after numerous postponements, decided not to go forward with the project. Rogalski testified that he considered the site for a pizzeria, but ultimately determined that the construction was not moving at a satisfactory pace and was concerned that other portions of the building had not been rented.
Greg Bankhurst testified that he received various masonry bids for the project then set up interviews of the candidates. He and Zipkin's son, Andrew Goldstein, met with David Giambrone and Matt Birch of Giambrone. At this meeting, Bankhurst and Goldstein told Giambrone that they expected the same foreman to be on the job from beginning to end, that there would be proper staffing, and that things were done "on time" because they wanted the building opened for the Christmas season. Plaintiff was to provide most of the materials, but, according to Bankhurst, the anchors and ties for the project were to be supplied by Giambrone.
Bankhurst also testified that Giambrone worked continuously on the project from June 24, 1996 until October 24, 1996. On July 12, 1996, Birch sent Bankhurst a memo in which he indicated that Giambrone would not be present at the site for a while because of complaints that they had with the job, and masonry work subsequently ceased for one week. According to Bankhurst, the complaints concerned matters that had no effect upon Giambrone's ability to perform its portion of the contract and did not provide valid reasons for stopping work. Bankhurst also claimed that Giambrone simply had another job to perform at this time. Thereafter, Giambrone did not properly staff the job.
Finally, Bankhurst outlined for the jury numerous written change orders which concerned Giambrone's permitted deviations from the written specifications. Each outlined the change and the resulting cost, and one such change order concerned addition of heavy plastic and portable heaters ("winter protection") which were not anticipated when the project was bid. He also stated that Giambrone was paid each month but did not finish the job. He denied that other tradesmen refused to perform their portions of the job because they had not been paid.
On cross-examination, Bankhurst acknowledged that he had written a letter to the architect regarding his refusal to attend additional meetings until he received additional funds. In addition, Bankhurst faxed a letter to plaintiff complaining about not being paid and not being paid the full amount due. Bankhurst also admitted that Giambrone refused to sign a "Turner" contract which renders the subcontractor liable for various delays, whether directly attributable to that subcontractor or not. Instead, Giambrone indicated that he would sign a standard AIA contract. He also admitted that he did not tell Giambrone that the job had to be completed by a specific date, but he stated that he told them that the building had to be substantially complete by mid-October 1996. No date was ever included on the written documents, however.
As to plaintiff's claim regarding the unfinished items, Bankhurst admitted that many of these items would not delay completion of the building. In addition, various documents written to Bankhurst notified him of matters which he needed to attend to in order to expedite completion of the building and other documents written by Bankhurst to plaintiff reiterate that plaintiff must pay certain subcontractors. He also authenticated a photograph taken in February 1997 which shows that the windows and elevator had not been installed.
Finally, Bankhurst admitted that plaintiff did not want to order special brick needed to make interlocking corner joints and that an application for payment dated October 1996, which Bankhurst approved, indicates that the job was 90% complete.
Andrew Goldstein, Lewis Zipkin's son, testified that delays on the masonry caused delays for the roofer, the window installer, and other subcontractors. He testified that he promptly paid Giambrone from June through October 1996 but by the end of October, it became apparent that Giambrone would not finish its job and he did not pay the final bill. In addition, he had to hire other masons to finish the job for a total of $24,500. Other expenses were incurred to complete the work during the winter months, but he admitted that in Giambrone's counter proposal, Giambrone refused to provide inclement weather protection for the job.
Goldstein also testified that it was his intention to rent the premises in October 1996, even though the interior was unfinished and to then enter into agreements for the individual tenants to complete the interiors then begin payment three months later.
Goldstein admitted that the glass subcontractor had not been paid, and that there was a dispute regarding the payment of the architect.
Lewis Zipkin testified that he is a real estate developer and that he is the trustee and owner of the site at issue. He explained that he found it too difficult to obtain permanent financing for the project so it was his intention to use his own resources to get construction underway, then, after obtaining leases, to obtain bank loans for completing the project. He hoped to have the building complete before the Christmas 1996 shopping season. According to Zipkin, Giambrone continuously understaffed the project and delayed completion of the building. These delays in turn resulted in the loss of tenants and a loss of rental revenue. By December 1996, it was clear that Giambrone would not finish the project and it was not completed until well into 1997. Zipkin stated that he incurred additional costs of hiring another mason, and related expenses. He admitted, however, that Giambrone told him that if he were paid, he would finish the job and Zipkin also admitted that he has had to work out payment plans with many of the subcontractors. He stated that most of the subcontractors had been paid as of the time of trial.
For its key evidence, Giambrone presented the testimony of Christopher Sofranko of Lakeland Glass, Mark Fremont of Epic Steel, and Giambrone workers Terence Cancian, Joseph Boffa, David Giambrone and Matthew Birch.
Sofranko testified that Zipkin told him that he anticipated that the project would be compete in the spring of 1997. Lakeland installed the windows but ultimately had to file a lawsuit in order to be paid. Zipkin responded to Lakeland's request for payment by indicating that Lakeland had delayed the project, resulting in the loss of tenant revenue. Mark Fremont of Epic Steel testified that Epic designed and fabricated the structural steel for the project. There was no schedule for completion but this subcontractor knew that plaintiff would like to have tenants in the building by the Christmas season. Epic did not always receive timely payment, however.
Terence Cancian, labor foreman for Giambrone, testified that there was not much room at the site because of the location and this limited the number of people who could work there. He also testified that it is not the responsibility of masons to obtain the steel connectors between wythes, and that Goldstein, Bankhurst, and another employee of Giambrone selected the ties that were used at this project.
Joseph Boffa, who also worked as foreman for Giambrone, stated that the work of the masons was delayed by other contractors whose product did not properly fit the area to be bricked. They also waited for cut stone to be delivered by another subcontractor. With regard to connecting the wythes, Boffa testified that Giambrone used the corrugated ties at sixteen inch intervals and, layered in above these connectors, installed Durawall or a ladder shaped wire connector. Boffa admitted, however, that the Durawall was not visible from certain construction photographs taken of the site.
David Giambrone testified that in his initial meeting with plaintiff, plaintiff discussed quality and the need for the same foreman on the job. There was no schedule for completion but he agreed to do the job as quickly as he could. Giambrone stated, however, that materials were not timely delivered and the entire job was not properly coordinated. Giambrone also stated that his company filed a mechanics lien on the premises in December 1996 because it was owed $65,609.26. He stated that he believed that the project was properly staffed.
Giambrone admitted, however, that an expert whom he had retained indicated that the use of corrugated ties would violate the building code, but his opinion would change if Durawall were also installed. He also admitted that he believed that the masonry work should have been completed in October 1996.
Matthew Birch, Vice President of Giambrone, testified that the contract price was $314,600. Deducting for work which was not performed, Giambrone was presently owed $79,944.14, including certain change orders.
After all the evidence was presented, counsel for Courtyard admitted in closing argument that Giambrone was owed money (Tr. 989-990, 992). He stated, however, that any sum due Giambrone should be considered in relation to the sum which Giambrone owed to plaintiff for construction delays and deficiencies (approximately $280,000). The trial court took a brief recess[1] and later, during its charge to the jury, directed a verdict for Giambrone on its counterclaim for $75,968.14 for unpaid masonry work (noting that Courtyard did not dispute this amount, but only challenged two of Giambrone's invoices totaling $3,976).
Thereafter, the jury retired to deliberate Courtyard's claims against Giambrone, as well as Giambrone's claim for the additional invoices totaling $3,976. The jury subsequently found in favor of Giambrone on all of plaintiff's claims and also awarded Giambrone the disputed $3,976 remaining upon its counterclaim. Courtyard now appeals and assigns two errors for our review.[2]
Courtyard's first assignment of error states:
 IT WAS PLAIN ERROR FOR THE TRIAL COURT JUDGE TO DIRECT THE JURY TO FIND A VERDICT FOR THE DEFENDANT ON THEIR BREACH OF CONTRACT CLAIM AGAINST THE PLAINTIFF AND TO DIRECT THE JURY TO AWARD THE FULL DAMAGES CLAIMED BY THE DEFENDANT AGAINST THE PLAINTIFF.
Within this assignment of error, Courtyard asserts that the trial court erred in directing a verdict for Giambrone upon its counterclaim and in informing the jury that it was entitled to $75,968.14. Courtyard contends that the trial court impeded the jury's duty to ascertain the damages due in relation to any setoff of the parties' mutual obligations to each other.
R.C. 2315.18 suggests that juries are required to determine damage awards with reference to what a party is entitled to recover from the adverse party. A trial court may, in some circumstances, have the jury perform any setoff before deriving its final awards, but is not required to do so. See Brainard v.Lane (1875), 26 Ohio St. 632, paragraph one of the syllabus. See, generally, 75 Ohio Jurisprudence 3d (1987), Pleading, Section 291. We are therefore unable to accept Courtyard's claim that the trial court erred in directing a verdict for Giambrone in the amount of $75,968.14 without requiring the jury to calculate the amount of damages after first deriving any setoff.
Further, the actions of the trial court were entirely correct in light of the admissions made by Courtyard's counsel which negated any dispute as to the $75,969.14 debt. That is, in Hakev. The George Wiedemann Brewing Co. (1970), 23 Ohio St.2d 65, the Supreme Court determined that defendant's counsel's assertion in opening statement that the evidence would disclose that an empty beer keg accidentally slipped from hands of defendant's employee, constituted a judicial admission sufficient to establish exclusive management and control on part of defendant at time of injury. Accord Ornella v. Robertson (1968), 14 Ohio St.2d 144;Muskingum Watershed Conservancy Dist. v. Funk (1938), 134 Ohio St. 302
. Thus, the arguments or statements of counsel may be considered as judicial admissions in this instance, thereby rendering the entry of the directed verdict proper in this instance.
We would also note that, in our estimation, although this case concerned numerous claims and many documents, the jury's ultimate duty was to determine whether Giambrone failed to timely perform the masonry work thereby delaying the entire project, or whether plaintiff caused the delays by failing to attend to certain key construction matters and by failing to promptly pay its subcontractors. In short, from the record and the proceedings herein, there is no basis upon which we may conclude that the jury lost its way in finding Giambrone's claims to be more credible than plaintiff's.
The first assignment of error is without merit.
Courtyard's second assignment of error states:
 THE INTEGRITY OF THE JUDICIAL SYSTEM DEMANDS THAT THE LOWER COURT SHOULD BE REVERSED BECAUSE THE DECISION BELOW WAS THE RESULT OF THE PREVAILING PARTY'S FORMULATING A FABRICATED DEFENSE THAT TURNED OUT TO BE ENTIRELY FALSE.
Plaintiff next asserts that the directed verdict for Giambrone on its counterclaim must be reversed since it was rendered based upon Giambrone employees' false testimony that they installed Durawall on the north end of the building. Plaintiff insists that a new trial is warranted because its expert, Joseph Nyzen, examined the wall after the trial, and observed the wire ties which are part of this product, but could not confirm that they were properly attached to the facade of the building.
Within this assignment of error, plaintiff is reiterating the claims which it originally raised in its motion for a new trial. As this court has determined that it does not have jurisdiction to review the trial court's denial of plaintiff's motion for a new trial (case no. 75624) since plaintiff did not timely file a notice of appeal from that ruling, we are likewise prohibited from reviewing the claims raised within this assignment of error.
In any event, the report of plaintiff's expert indicates that a "simple, invasive procedure can now be done to verify" the post-trial views of Courtyard's expert. Falsity therefore has not been demonstrated.
This assignment of error is overruled.
The judgment of the trial court is affirmed.
It is ordered that appellees recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
O'DONNELL, J., AND SPELLACY, J., CONCUR.
 ______________________ ANN DYKE ADMINISTRATIVE JUDGE
[1] After this appeal was filed, Giambrone sought correction of the record to reflect what transpired during this recess. The trial court subsequently certified to this court that during the recess, it informed the parties that it would direct a verdict for Giambrone on its counterclaim, in light of the admissions made by Courtyard's counsel during closing argument. In response, Courtyard's counsel indicated that he disputed $3,976 of this amount.
[2] The record reflects that Courtyard also filed a motion for a new trial in which it asserted that it had learned, following trial, that Giambrone had secured the brick wythe (or exterior masonry layer) to the block wythe (or interior masonry layer) by using corrugated ties at 32" intervals, not at 16" intervals as Giambrone had stated at trial, and that it did not appear, from an x-ray taken of the building, that "Durawall" had been installed as claimed. The trial court denied the motion and Courtyard appealed to this court in case no. 75624. On December 18, 1998, this court dismissed appeal no. 75624 as untimely.